**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHIESI USA, INC., | |
| *Plaintiff*, | |
| v. | Case No. 24-cv-00260 (ACR) |
| ROBERT F. KENNEDY, JR., *et al.*, | |
| *Defendants*. | |

**MEMORANDUM OPINION AND ORDER**

Under the Medicaid Drug Rebate Program (MDRP), drug manufacturers that raise prices faster than inflation must reimburse Medicaid for the difference through rebates. The rebate equals the gap between the drug's inflation-adjusted launch price and its current average price, multiplied by the number of units dispensed. The more a price increase outpaces inflation, the larger the rebate; the closer it tracks inflation, the smaller the rebate.

Simple enough—usually. What happens, though, when a manufacturer releases the same drug in a different dosage strength, *i.e.*, 20 mg instead of 10 mg per pill? Which drug's launch date controls the rebate calculation—the original version or the new-strength one? The MDRP offers a guidepost: the answer turns on whether the new-strength drug is a "new formulation" of the original drug. *If so*, both the original drug's and the new-strength drug's launch dates are used to calculate the rebate, and the higher amount applies. *If not*, only the new-strength drug's launch date applies.

In 2020, Defendant Centers for Medicare and Medicaid Services (CMS) issued a Final Rule interpreting "new formulation" to include new-strength versions of an existing drug, thereby triggering the "if-so" scenario above. Plaintiff Chiesi USA, Inc. challenges that rule

1

and a subsequent interpretive rule, claiming they violate the Administrative Procedure Act, 5

U.S.C. § 551 *et seq*.  The Court disagrees.  Because (1) the Final Rule reflects the best reading

of the statute and is neither arbitrary, capricious, nor constitutionally infirm, and (2) the

subsequent interpretive rule is exempt from notice-and-comment procedures, the Court

**GRANTS** Defendants' Motion for Summary Judgment, Dkt. 22, and **DENIES** Plaintiff's

Cross-Motion for Summary Judgment, Dkt. 24.

## I.     BACKGROUND

### A.  Factual Background

#### 1.  The Medicaid Drug Rebate Program

In 1990, concerned that the government was overpaying for prescription drugs, *see* H.R.

Rep. No. 101-881, at 96–97 (1990), Congress enacted the MDRP to reduce federal spending on

Medicaid, *see* Omnibus Budget Reconciliation Act of 1990, Pub. L. No. 101-508, tit. IV, subtitle

B, pt. 1, 104 Stat. 1388-141.  The MDRP requires drug manufacturers that sell drugs to Medicaid

to pay two rebates to help offset the drugs' costs: a "[b]asic rebate," 42 U.S.C. § 1396r-8(c)(1),

and an "[a]dditional rebate," *id*. § 1396r-8(c)(2).

This case involves the additional rebate, which kicks in when a manufacturer raises a

drug's price faster than the rate of inflation.  *See id*. § 1396r-(8)(c)(2).  The MDRP provides the

formula for the additional rebate: (1) subtract the drug's inflation-adjusted launch price from its

current average price, and (2) then multiply the difference by the number of units dispensed "for

which payment was made" during the applicable rebate period.  *See id.* § 1396r-8(c)(2)(A).

Originally, the MDRP required separate rebate calculations for "each dosage form and

strength" of a drug.  *Id.*  This language, it turned out, created a loophole that some manufacturers

exploited.  They sidestepped the additional rebate by launching new versions of the same drug—

such as variations in the original drug's delivery method (oral capsules, compounded liquids, etc.)—at higher prices.  *See* H.R. Rep. No. 111-299, pt. 1, at 635 (2009).  Because CMS then calculated the rebate owed based on the launch date of the new-version drug (not of the original drug), the manufacturer would not owe any additional rebate at launch.

### 2.  The "Line Extension" Provision

In 2010, Congress closed the loophole by adding a "line extension" provision to the MDRP.  *See* 42 U.S.C. § 1396r-8(c)(2)(C)(iii).  This provision targets drugs that are "a line extension of a single source drug or an innovator multiple source drug that is an oral solid dosage form."  *Id.*  As relevant here, the MDRP defines a "line extension" as "a new formulation of the drug, such as an extended release formulation."  *Id.*  Congress did not define "new formulation," though the phrase "such as" before "extended release" signals that extended release is just one example.

A line extension (*i.e.*, new formulation) drug is now subject to the greater of two rebate amounts.  Amount One is calculated using the line extension drug's own price increases, following the same method used for the standard additional rebate.  *See id.* § 1396r-8(c)(2(C)(ii).  Amount Two applies the highest additional-rebate percentage owed on any version of the original drug to the line extension's price.  *See id.* § 1396r-8(c)(2)(C)(iii).  In other words, a rebate can be driven not just by the line extension drug's own price hikes, but also by inflation penalties tied to the original drug.

### 3.  Agency Definition of "New Formulation"

Because Congress did not define "new formulation," CMS stepped in—sort of.  In 2012, it proposed a definition of line extension that would have excluded new-strength drugs, but it ultimately chose not to finalize any regulatory definition.  81 Fed. Reg. 5,170, 5,197 (Feb. 1,

3

2016).  The agency subsequently stated that "[i]f [it] later decide[d] to develop a regulatory definition of line extension, [it] would do so through [its] established . . . rulemaking process and issue a proposed rule."  84 Fed. Reg. 12,130, 12,132 (Apr. 1, 2019).  And through May 2020, CMS advised manufacturers "to rely on the statutory definition of line extension" and "use reasonable assumptions in their determination of whether their drug qualifies as a line extension drug."  81 Fed. Reg. at 5265.  Up to this point, no binding regulatory definition of "new formulation" existed.

In June 2020, CMS truly stepped in by proposing a new rule defining both "line extension" (mirroring the statute) and "new formulation."  85 Fed. Reg. 37,286, 37, 294–95 (June 19, 2020).  The agency justified the need for the rule on three grounds: (1) manufacturers had financial incentives to under-report line extensions, since line extension drugs might be subject to higher rebates; (2) years of experience had shown inconsistent reporting practices across manufacturers; and (3) the agency wanted to ensure that the provision matched congressional intent.  *See id.* at 37,294.

Of relevance to us, the proposed rule included new-strength drugs as "new formulations," meaning they would be tied to the original drug's launch date.  Drug manufacturers objected. Strenuously.  And on several grounds: (1) reliance interests based on CMS's prior guidance excluding new-strength drugs; (2) potential harm to pharmaceutical innovation; and (3) alleged conflict with the line extension provision's statutory text.  *See* Dkt. 24-1 at 15–19.

CMS responded that the line extension provision in the MDRP does not *exclude* new-strength drugs, and it described changes in strength as "relatively simple modification[s] to a currently marketed product."  85 Fed. Reg. 87,000, 87,040 (Dec. 31, 2020); *see* 42 C.F.R. § 447.502.  The agency warned that excluding new-strength drugs would incentivize

manufacturers to "change the strength of a drug that is losing its exclusivity or patent protection . . . preventing money saving generic substitution."  85 Fed. Reg. at 87,040.  It concluded that a "new strength of a drug, produced or distributed at a time later than the initial strength(s), should be identified as a line extension."  *Id.*  CMS also acknowledged comments regarding prospective implementation, the effects on impacted parties, and its shift in position from its earlier approach. *See id.* at 87,033–45*; see also infra* Section III.B.

The Final Rule, issued in December 2020 and effective January 1, 2022, defines "new formulation" broadly to include: "a change to the drug, including, but not limited to: an extended-release formulation or other change in release mechanism, a change in dosage form, strength, route of administration, or ingredients."  85 Fed. Reg. at 87,101 (adding definitions to 42 C.F.R. § 447.502).  In short, then, CMS's new rule treats a new-strength drug as a new formulation of an existing drug.

In November 2023, CMS issued Manufacturer Release No. 119 (the Release), clarifying how the Final Rule applies.  The Release confirmed that the Final Rule covers "all drugs" in the MDRP as of the Final Rule's effective date.  It explained that the Final Rule is retrospective only in setting baseline pricing—using a drug's original launch date price—but does not alter past MDRP rebate payment calculations.  In that latter sense, its effect is prospective.  CMS Manufacturer Release No. 119 (Nov. 7, 2023), https://www.medicaid.gov/sites/default/files/2023-11/mfr-rel-119.pdf; *see also* 85 Fed. Reg. at 87,043–44.

### 4.  Procedural Background

Plaintiff Chiesi USA, Inc., a drug manufacturer, produces Ferriprox® (deferiprone) 500 mg tablets, a drug approved to treat transfusional iron overload in patients with thalassemia

syndromes.  Dkt. 1 at 5.  Following that approval, Plaintiff developed and marketed additional

Ferriprox® products, including a 100 mg/mL Oral Solution, 1000-mg tablets taken three times

daily (TID), and 1000-mg tablets taken twice daily (BID).  *See* Dkt. 24-1 at 14–15.  Plaintiff

launched these products before CMS finalized the Final Rule.  *See id.* at 1, 11–14.

As a participant in the MDRP, Plaintiff regularly reported its drug and pricing data to

CMS, relying—as CMS had instructed—on "reasonable assumptions" in determining line

extension status.  *See id.* at 15.  Plaintiff informed CMS that, in its view, none of the newer

Ferriprox® products (except the 1000-mg BID version) qualified as line extensions of the 1000-

mg TID tablet.  *See id*.  But under the Final Rule, CMS now treats these later products as "new

formulations" for rebate purposes.

On January 29, 2024, Plaintiff sued Xavier Becerra, Secretary of Health and Human

Services (HHS), and Chiquita Brooks-LaSure, Administrator of CMS (collectively, Defendants),[1]

challenging the Final Rule and the Release under the Administrative Procedure Act (APA), 5

U.S.C. § 706(2).  Dkt. 1 at 22.  Plaintiff makes four claims.  First, it argues that the Final Rule's

expanded definition of "new formulation" unlawfully broadens the line extension provision and

exceeds CMS's statutory authority.  Dkt. 24-1 at 19–21.  Second, it argues that CMS engaged in

arbitrary and capricious rulemaking when the agency failed to respond adequately to comments

about new-strength drugs, overlooked manufacturers' reliance interests, and did not reasonably

explain its reversal in position.  *Id.* at 22–27.  Third, it argues that the Final Rule is retroactive

and coercive, violating due process and other constitutional protections.  *Id.* at 27–37.  Fourth

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Secretary of Health and Human Services
Robert F. Kennedy, Jr. and Administrator for the Centers for Medicare and Medicaid Services
Mehmet Oz are "automatically substituted" for their predecessors.

and finally, it argues that the Release is a legislative rule that should have undergone APA notice-and-comment rulemaking. *Id.* at 37–40.

Defendants counterpunch. First, they assert that the Final Rule is a lawful and reasonable interpretation of the line extension provision. Dkt. 26 at 9–18. Second, they maintain that CMS's actions were not arbitrary and capricious because the agency responded to public comments and explained its policy shift. *Id.* at 18–27. Third, they argue that the Final Rule is neither retroactive nor coercive, and participation in the MDRP remains voluntary. *Id.* at 27–37. Finally, they argue that the Release is merely interpretive and therefore exempt from formal notice-and-comment procedures. *Id.* at 37–38.

## II.    LEGAL STANDARD

Under the APA, courts must set aside an agency's regulation if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In so deciding, "the district court does not perform its normal role but instead sits as an appellate tribunal" resolving legal questions. *Cnty. of Los Angeles v. Shalala*, 192 F.3d 1005, 1011 (D.C. Cir. 1999) (cleaned up). Judicial review is governed by the APA's standards and decided on the administrative record. *See Se. Ala. Med. Ctr. v. Sebelius*, 572 F.3d 912, 916–17 (D.C. Cir. 2009). In this context, "summary judgment serves as the mechanism for deciding, as a matter of law, whether agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Cap. Area Immigrants' Rts. Coal. v. Trump*, 471 F. Supp. 3d 25, 37 (D.D.C. 2020) (cleaned up).

## III.    ANALYSIS

For the reasons below, the Court rejects Plaintiff's claims.

## A.  The Final Rule Reflects the Best Reading of the Line Extension Provision

Plaintiff first argues that the Final Rule defines "new formulation" more broadly than the MDRP permits.  Dkt. 24-1 at 19–21.  Not so.

Under the APA, courts must set aside agency action that is "not in accordance with law" or that exceeds statutory authority.  5 U.S.C. § 706(2)(A), (C).  Using the "traditional tools of statutory construction," courts use their "independent judgment" to determine the "single[] best meaning" of a statute and assess whether an agency "has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400–01, 406, 409, 412 (2024).  Courts may look to the agency's views, but only to the extent that those views persuade based on factors like the thoroughness of the agency's reasoning and its consistency over time.  *Id.* at 388 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

### 1.  The Final Rule Conforms to the Plain Text and Structure of the MDRP

Plaintiff insists that the Final Rule contradicts the plain text of the MDRP.  But the statute's text and structure tell a different story.  To start, "Congress knows to speak in plain terms when it wishes to circumscribe, and in capacious terms when it wishes to enlarge, agency discretion."  *City of Arlington v. FCC*, 569 U.S. 290, 296 (2013).  Here, it spoke in capacious terms.  The MDRP defines "new formulation" by way of illustration—offering "an extended release formulation" as one example, prefaced with the phrase "such as," which signals a broad scope.  *See id*.  And the Final Rule builds logically from that open-ended foundation.  It defines "new formulation" as "a change to the drug," and, like the line-extension provision, offers illustrative examples: changes to release mechanisms, dosage forms, strengths, routes of administration, and ingredients.  42 C.F.R. § 447.502.  CMS reasonably embraced the statute's flexibility in its Final Rule.

CMS's reading also makes linguistic and legal sense. "New" means "[n]ot existing before; now made, introduced, or discovered for the first time; novel." Dkt. 34 at 2 (quoting *New*, *Oxford English Dictionary* (2d ed. 1989)). "Formulation" refers to "[a] material or mixture prepared according to a particular formula." *Id.* (quoting *Formulation*, *Oxford English Dictionary* (2d ed. 1989)). And "formula," in turn, means "[a] prescription or detailed statement of ingredients; a recipe." *Id.* (quoting *Formula*, *Oxford English Dictionary* (2d ed. 1989)). Combine these definitions, and a "new formulation" arises when a drug is prepared in a way distinct from prior versions. That phrase is what Congress wrote. That phrase is what CMS interpreted. And that interpretation tracks the best reading of the line-extension provision.

A simple example illustrates the point. Consider *The Matrix*[2] world of Medicaid pricing. In 1991, Neo Corp. launched Blue Pill (10 mg) and Red Pill (10 mg). The former immerses you in blissful ignorance; the latter forces you to accept the harsh truths of reality—two very different products. Years later, Neo Corp. introduced Red Pill (20 mg): same reality-revealing effect, just a higher-strength pill. Before the Final Rule, Medicaid treated the 10-mg and 20-mg versions as separate drugs for rebate purposes, giving the 20-mg versions a fresh baseline date and a fresh start for avoiding inflation penalties. The line extension provision, however, closes that loophole. If Red Pill (10 mg) carries a high additional-rebate percentage, that percentage also applies to Red Pill (20 mg) as a line extension. Different strength, same drug. That is what "new formulation" captures.

Of course, CMS's discretion is not boundless. A "new formulation" must still offer a variation of an *existing* drug. A genuine link must exist between the original and the alleged extension. Not every substitution qualifies. As the Fourth Circuit put it, Tylenol is not a line

---

[2] *The Matrix* (Warner Bros. 1999).

extension of Advil, even though both relieve pain.  *Vanda Pharms., Inc. v. CMS*, 98 F.4th 483, 494 (4th Cir. 2024), *cert. denied*, 145 S. Ct. 1047 (2025).  But CMS's inclusion of new-strength drugs falls comfortably within Congress's framework.  The Final Rule thus reflects a sound interpretation of the statute.

### 2.  The Final Rule Closes the Loophole Congress Identified

If Plaintiff had its way, manufacturers could still take advantage of the very loophole Congress set out to close.[3]  Congress amended the MDRP in 2010 to prevent manufacturers from avoiding inflation-based rebates simply by introducing a slightly altered version of an existing drug and thereby securing a fresh "base date" for rebate calculations.  *See supra* Section I.A.1.  Because the additional-rebate formula compares a drug's current price to its inflation-adjusted launch price, this reset allowed the "new" product to escape penalties tied to the original drug's price increases.

To stop that practice, Congress required that line extensions be subject to two calculations: the standard inflation rebate for the line extension itself and an alternative rebate pegged to the price history of the original drug.  42 U.S.C. § 1396r-8(c)(2)(C)(i)–(iii); *see supra* Section I.A.2.  The manufacturer must pay whichever amount is higher.  This design ensures that a modest change in dosage form or strength, without more, will not wipe the slate clean for inflation penalties.  It would be odd indeed to interpret language meant to close that loophole as leaving it wide open.

---

[3] The Court "appl[ies] faithfully the law Congress has written" and does not "replace the actual text with speculation as to Congress' intent."  *See Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (quoting *Henson v. Santander Consumer USA Inc.*, 582 U.S 79, 89 (2017)).  The discussion in this section is relevant only insofar as it confirms that the Final Rule's definition of "new formulation" tracks Congress's aim in closing the line-extension loophole.

### 3.  The MDRP Does Not Incorporate a Technical Meaning of "New Formulation"

Plaintiff separately contends that the MDRP is a "technical" statute, and that the Court should therefore "give [the line-extension provision's] words their technical, rather than ordinary, meanings."  Dkt. 35 at 5.  Plaintiff claims that CMS "initially and long endorsed" the Food and Drug Administration's (FDA) "technical meaning" of "new formulation," pointing to the agency's 2012 position that "a 'new formulation' meant 'a change in the active ingredients . . . in a drug but no change in the amount of active ingredient.'"  *Id.* at 10 (quoting 77 Fed. Reg. 5,318, 5,339 (Feb. 2, 2012)).   From that, Plaintiff contends that new-strength drugs, which change the amount of an active ingredient, fall outside the definition of new formulation.  *See id.* at 5–6.

That argument falls flat.  When Congress wants CMS to rely on the FDA's views or the Federal Food, Drug, and Cosmetic Act (FDCA), it says so explicitly.  *See, e.g.*, 42 U.S.C. § 1396r-8(e)(4) (referencing the FDA); *id.* § 1396r-8(c)(1)(C)(i) (referencing the FDCA).  No such cross-reference appears in the line-extension provision.  Plaintiff also overstates CMS's past practice.  While CMS once considered using FDA's Chemical Type classifications to identify line extensions, it declined to do so in a 2016 final rule.  81 Fed. Reg. 5,170, 5,265 (Feb. 1, 2016).  Neither Congress nor CMS ever adopted the FDA's narrower interpretation. The Court sees no reason to treat it as binding now.

### B.  The Final Rule Is Neither Arbitrary nor Capricious

Plaintiff also argues that the Final Rule is arbitrary and capricious, claiming CMS failed to address critical comments.  Again, not so.

The arbitrary and capricious standard is "highly deferential," with a strong presumption that "the agency's action [is] valid."  *Env't Def. Fund, Inc. v. Costle*, 657 F.2d 275, 283 (D.C. Cir.

1981).  In reviewing the agency's explanation, courts "must consider whether the decision was based on a consideration of the relevant factors and whether there was a clear error of judgment." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 30–31 (1983) (cleaned up).  Agency explanations need not be elaborate or verbose—"[i]ndeed, nothing more than a 'brief statement' is necessary, as long as the agency explains 'why it chose to do what it did.'"  *Coe v. McHugh*, 968 F. Supp. 2d 237, 240 (D.D.C. 2013) (quoting *Tourus Recs., Inc. v. Drug*, 259 F.3d 731, 737 (D.C. Cir. 2001)).

Plaintiff claims CMS failed to respond to comments it received on three fronts: (1) the effect on manufacturers relying on prior guidance, (2) innovation incentives, and (3) statutory authority.  *See* Dkt. 24-1 at 19–27.  And it also claims that CMS failed to explain its shift in position on including new strengths under "new formulation."

The record again tells a different story.  As discussed above, *see supra* Section I.A.3, CMS responded to these concerns.  On manufacturer impact, CMS acknowledged concerns but emphasized that "[a]pplying the alternative rebate calculation should not categorically lead to decreased revenue for a manufacturer; rather, it continues to apply rebate the inflation-based rebate that applies to the initial brand name listed drug."  85 Fed. Reg. at 87,037.  The agency recognized that some rebates might increase but justified this outcome as a necessary byproduct of interpreting the statutory definition, "provid[ing] clarity to . . . manufacturers," and thus "assisting manufacturers in ensuring their compliance with section 1937(c)(2)(C) of the Act."  *Id.* at 87,032, 87,037.

Next, CMS rejected the idea that the new definition penalizes innovation, insisting "[t]he fact that the innovation may lead to a higher rebate obligation . . . is not the result of the innovation," and that "[m]anufacturers will continue to have incentives to innovate based on

multiple factors." *Id.* at 87,037. The agency conceded that its treatment of line extension drugs may increase rebate amounts but found no basis to believe this would deter innovation. *See id.*

On statutory authority, CMS pointed out that the line extension provision "does not define new formulation" and reasoned that if Congress had intended to limit the definition, it would have said so. *Id.* at 87,035.

These responses easily meet the "brief statement" bar. *See Tourus Recs.*, 259 F.3d at 737. CMS explained "why it chose to do what it did," *id.* (citation omitted), cited calls for "more specific guidance on how to identify a line extension drug," 85 Fed. Reg. at 87,034, and "noted inconsistency among manufacturers" during the self-reporting period, *id.* Based on this reasoning, it reasonably concluded that expanding the "line extension" definition better aligns with congressional intent. *Id.* at 87,035.

Regarding CMS's prior guidance, agencies are free to change course—so long as they explain why.

> When making a "policy change," an agency "must show that there are good reasons for the new policy," but "need not always provide a more detailed justification" for changing course "than what would suffice for a new policy created on a blank slate," and the agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one."

*Ctr. for Biological Diversity v. Nat'l Marine Fisheries Serv.*, 628 F. Supp. 3d 189, 211 (D.D.C. 2022) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (emphasis in original)). Even when prior guidance creates "serious reliance interests," the agency's burden is the same: a reasoned explanation. *See Fox Television Stations,* 556 U.S. at 515–16. And where facts have changed or the agency reaches a new judgment, "it need only explain itself and [courts] will defer." *Am. Farm. Bureau Fed'n v. EPA*, 559 F.3d 512, 521 (D.C. Cir. 2009).

Here, CMS did exactly that. It explained that it based its shift—from declining to classify new-strength drugs as new formulations to adopting that classification in the Final Rule—on CMS's continued experience applying the statute, persistent industry confusion, inconsistent manufacturer reporting, and stakeholder requests for clearer guidance. *See* 85 Fed. Reg. at 37,294. Those reasons more than suffice to justify the agency's revised interpretation.

In short, CMS addressed the comments, explained its rationale, and acted well within its discretion. The Court finds no basis to deem the Final Rule arbitrary or capricious.

## C. The Final Rule Does Not Violate Plaintiff's Constitutional Rights

Plaintiff's third argument brands the Final Rule as unconstitutionally retroactive and coercive. A third time, not so.

### 1. The Final Rule Is Not Retroactive

Plaintiff claims that the Final Rule retroactively changes the legal consequences of its past conduct. That is incorrect. The Final Rule operates prospectively—it does not disturb rebate calculations for drugs sold before 2022 and gave Plaintiff ample notice of its scope and impact.

#### a. The Final Rule Applies Prospectively

The Due Process Clause of the U.S. Constitution "protects the interests in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994). In the rulemaking context, "an agency may not promulgate a retroactive rule absent express congressional authorization." *Northeast Hosp. Corp. v. Sebelius*, 657 F.3d 1, 13 (D.C. Cir. 2011). But a rule that "alters the future effect, not the past legal consequences of an action, or that upsets expectations based on prior law, is not retroactive." *Mobile Relay Assocs. v. FCC*, 457 F.3d 1, 11 (D.C. Cir. 2006) (cleaned up). A rule is retroactive only "if it

takes away or impairs vested rights acquired under existing law, or creates a new obligation, imposes a new duty, or attaches a new disability in respect to transactions or considerations already past." *Nat'l Min. Ass'n v. Dep't of Lab.*, 292 F.3d 849, 859 (D.C. Cir. 2002) (cleaned up).

Plaintiff contends that the Final Rule improperly rewrites the past "by requiring manufacturers to apply the definition of new formulation to *all* drugs, regardless of whether the drug is approved on or after January 1, 2022." Dkt. 24-1 at 28.  That is a red herring.[4]  The Final Rule does not require Plaintiff, or any other manufacturer, to recalculate past rebate payments for new-strength drugs.  *See* 85 Fed. Reg. at 87,043–44.  Plaintiff paid what it paid. What changes is the *future*: from the Final Rule's January 1, 2022, effective date forward, CMS will calculate rebates for new formulations (including new-strength drugs) using the baseline date of the original drug, and will apply the higher resulting additional-rebate amount.

As if one Red Pill were not enough, a return to *The Matrix* helps illustrate the distinction.  In that world, Neo Corp. released Red Pill (10 mg) in 1991 and Red Pill (20 mg) in 2009.  All rebate obligations incurred before January 1, 2022, remain untouched, even though Neo Corp. had not identified the 20-mg version as a line extension before that date.  But after January 1, 2022, CMS would treat the 20-mg version as a new formulation of the 10mg and apply the higher additional-rebate amount owed on either strength.  The change affects only payments going forward, not the amounts already due for past transactions.  That is a prospective, not retrospective, change.

---

[4] *See United Mexican States v. Lion Mex. Consol., L.P.*, 757 F. Supp. 3d 18, 34 n.13 (D.D.C. 2024) (explaining the "fishy etymology" of "red herring").

In any event, Plaintiff's pre-2022 investments and pricing strategies did not confer a right to permanent regulatory stasis. By Plaintiff's logic, no agency could ever modify a regulation affecting products previously approved or sold. For obvious reasons, the D.C. Circuit has rejected the idea that an agency's policy change, even one that frustrates private reliance interests, constitutes impermissible retroactivity. *See Chem. Waste Mgmt., Inc. v. EPA*, 869 F.2d 1526, 1536 (D.C. Cir. 1989). "That agencies may change their minds is, after all, a matter of hornbook law." *Nat'l Cable & Telecomms. Ass'n v. FCC*, 567 F.3d 659, 671 (D.C. Cir. 2009).

In short, CMS may adjust regulations to reflect evolving policy judgments, and Plaintiff has no constitutional entitlement to a frozen regulatory landscape.

### b.  *Plaintiff Received Fair Notice*

The Due Process Clause also requires that regulated entities receive fair warning about what a rule prohibits or requires. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 156 (2012). A party has fair notice "when, by reviewing the regulations and other public statements issued by the agency, it can identify, with ascertainable certainty, the standards with which the agency expects parties to conform." *Northstar Wireless, LLC v. FCC*, 38 F. 4th 190, 216 (D.C. Cir. 2022) (cleaned up).

Plaintiff argues it lacked adequate notice because, at the time it acquired Ferriprox®, CMS had not previously interpreted "new formulation" to include new strengths of a drug. Dkt. 24-1 at 29. But Plaintiff had more than enough notice. First, CMS published the proposed rule in June 2020, explicitly signaling its intent to revise the definition of "new formulation" to include different strengths. *See* 85 Fed. Reg. at 37,295–96. Second, Plaintiff had a year between the Final Rule's publication and its effective date to prepare for its implementation.

16

Indeed, notice here was not just sufficient—it was robust. As the D.C. Circuit has held, when affected parties submit comments during a rulemaking process, that alone supports a finding that notice was adequate. *Abington Mem'l Hosp. v. Burwell*, 216 F. Supp. 3d 110, 134 (D.D.C. 2016) (citing *Appalachian Power Co. v. EPA*, 135 F.3d 791, 816 (D.C. Cir. 1998)). Here, the record shows that stakeholders commented on the Final Rule's scope and timing. And CMS responded clearly, reiterating that the revised definition would apply prospectively to all drugs in the MDRP. 85 Fed. Reg. at 87,043–44.

Plaintiff cannot claim surprise when CMS did what it said it would do. And the agency did so only after public notice and a full opportunity for comment.

## 2. The Final Rule Is Not Coercive

Plaintiff claims that participation in the MDRP is essentially mandatory, making the Final Rule unconstitutionally coercive and violative of its First, Fifth, and Eighth Amendment rights. Dkt. 24-1 at 30–37.

This argument fails for one key reason: no one forced Plaintiff to join the MDRP. The government controls its spending and may impose conditions on it. *See Horne v. Dep't of Agric.*, 576 U.S. 350, 364 (2015). If Plaintiff dislikes these conditions, it can opt out by ceasing participation.

Plaintiff analogizes to *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 612 (2013), where the Supreme Court emphasized that unconstitutional-conditions claims require showing the government could not have ordered the requested action outright, and that the government's conduct amounted to impermissible "pressure." *See* Dkt. 24-1 at 31–33. Here, however, the government is setting conditions for voluntary business participation, not

coercively pressuring manufacturers.  Because participation in the MDRP is voluntary, the Final Rule is not coercive or unconstitutional.

Taking each amendment Plaintiff cites in turn leads to the same conclusion.  Plaintiff argues that defining a regulated product as a "line extension" forces them to endorse the government's preferred message, violating the First Amendment.  Dkt. 24-1 at 35–37.  But labeling a new drug strength as a "line extension" under the Final Rule is a consequence of Plaintiff's voluntary choices: to participate and to raise prices above inflation.  And any "speech" involved, such as checking a box to identify a drug as a line extension, is incidental to the regulation of economic conduct.  *See Rumsfeld v. F. for Acad. & Inst. Rts.*, 547 U.S. 47, 62 (2006); *see also Rust v. Sullivan*, 500 U.S. 173, 193, 196 (1991).

Plaintiff separately contends the Final Rule forces them to "relinquish [their] property rights in its products" to participate in the MDRP, constituting an unlawful taking.  Dkt. 24-1 at 31–33.  But courts consistently hold that voluntary participation in price-regulated programs does not amount to a property deprivation.  *See Garelick v. Sullivan*, 987 F.2d 913, 916 (2d Cir. 1993) (collecting cases); *see also Baker Cnty. Med. Servs., Inc. v. U.S. Att'y Gen.*, 763 F.3d 1274, 1279–80 (11th Cir. 2014) (collecting cases).

Finally, Plaintiff asserts that the Final Rule imposes an excessive fine, violating the Eighth Amendment.  Dkt. 24-1 at 33–35.  The Excessive Fines Clause, however, applies when a payment is punitive.  *United States v. Bajakajian*, 524 U.S. 321, 328 (1998).  Here, the additional rebates are remedial, voluntary obligations that statutory pricing rules trigger. Plaintiff voluntarily participates in the MDRP and voluntarily raises prices faster than inflation, triggering these remedial rebates designed to offset excessive costs.

18

**D. The Release Is an Interpretive Rule**

Recall that CMS issued Manufacturer Release No. 119 in November 2023 to clarify how the Final Rule applies. *See supra* Section I.A.3. Plaintiff argues that the Release is a legislative rule issued without notice-and-comment procedures, in violation of the APA. And again, not so.

Under the APA, rules that carry the "force and effect of law" must undergo notice-and-comment rulemaking. *Nat'l Mining Ass'n v. McCarthy*, 758 F.3d 243, 250 (D.C. Cir. 2014) (citation omitted). But this requirement does not apply to interpretive rules, those that "merely interpret[] a prior statute or regulation" and do not themselves impose new obligations or duties. *Id.* at 252. To distinguish legislative from interpretive rules, courts look to whether the rule has "legal effect." *Id*. The D.C. Circuit has articulated a four-factor test:

> (1) whether in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties, (2) whether the agency has published the rule in the Code of Federal Regulations, (3) whether the agency has explicitly invoked its general legislative authority, or (4) whether the rule effectively amends a prior legislative rule.

*Am. Mining Cong. v. Mine Safety & Health Admin*., 995 F.2d 1106, 1112 (D.C. Cir. 1993). If any of these factors are met, the rule is legislative. *Id.*

Here, Plaintiff does not dispute the first three factors. Dkt. 24-1. Nor could it. The Final Rule itself provides an adequate legislative basis to enforce the revised line-extension definition starting January 1, 2022. CMS did not publish the Release in the Code of Federal Regulations. And the Release never invoked the agency's legislative rulemaking authority. *See* CMS Manufacturer Release No. 119. That leaves only the fourth prong: whether the Release "effectively amends a prior legislative rule." *Am. Mining Cong.*, 995 F.2d at 1112.

Plaintiff contends it does. In its view, the Release imposes "new and opposite obligations" by "requiring that manufacturers apply the new definition of 'new formulation' to

19

all products—even those approved prior to the effective date—for the purposes of determining whether they constitute line extensions." Dkt. 24-1 at 39–40.  Plaintiff cites CMS's statements during rulemaking that the new definitions would not apply retrospectively.  *Id.* at 39 (citing 85 Fed. Reg. at 87,043–44).

But the Court agrees with Defendants: the Release does not amend a prior rule.  It simply clarifies what CMS had already said in the Final Rule: that starting January 1, 2022, all drugs in the MDRP, including those already on the market, would be subject to the updated definitions.  85 Fed. Reg. at 87,043–44.

Indeed, in the Final Rule, CMS responded directly to commenters who argued that the new definitions should apply only to products introduced after the Final Rule's effective date:

> We do not agree that only products introduced on or after the effective date of the final rule should be subject to the . . . regulatory definitions of . . . line extension[] and new formulation.  Although manufacturers will not be required to apply the regulatory definitions . . . when calculating rebates for periods prior to the effective date of the final rule, the definitions become effective for all drugs that are on the market as of and following that effective date.

*Id.* at 87,045.

That passage makes the agency's intent unmistakably clear: no retrospective application, but full forward-looking application to all existing drugs in the MDRP beginning January 1, 2022.  The Release simply reiterates that point.

The Release also was "designed to provide additional information and clarity."  CMS Manufacturer Release No. 119 at 1.  To that end, CMS advised that "[r]egardless of prior status, CMS advises manufacturers that all drugs that are active in the [Medicaid Drug Program] system be evaluated to determine whether they satisfy the applicable regulatory definitions and whether they must be reported as line extensions."  *Id.* at 11.  The Release thus clarified, but did not change, the agency's position.  From 2020 until the effective date in

2022, manufacturers were not required to apply the new definitions when calculating rebates. But once that date arrived, all drugs—whether newly approved or not—were subject to the same definitions.

The Release is thus not an amendment.  It offers an interpretation consistent with both the text of the Final Rule and CMS's responses to public comments.  The Release does not trigger any element of the *American Mining Congress* test.  It therefore retains its status as an interpretive rule, exempt from notice-and-comment procedures under the APA.

### IV.    CONCLUSION AND ORDER

In sum, (1) the Final Rule aligns with the best reading of the statute and is neither arbitrary, capricious, nor constitutionally infirm, and (2) the Release is an interpretive rule. Thus, the Court hereby

**GRANTS** Defendants' Motion for Summary Judgment, Dkt. 22;

**DENIES** Plaintiff's Cross-Motion for Summary Judgment, Dkt. 24;

**DISMISSES** Plaintiff's Complaint, Dkt. 1, and this case with prejudice; and

**DIRECTS** the Clerk of Court to close this case.

**SO ORDERED.**

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).


Date: August 27, 2025                                   _____
                                                        ANA C. REYES
                                                        United States District Judge